UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DEMETRIUS MCBRIDE #192829,                    Case No. 2:20-cv-212

                       Plaintiff,             Hon. Hala Y. Jarbou
                                              Chief U.S. District Judge
        v.

BIENVENIDO B. CANLAS, et al.,

                       Defendant.
_____/

## REPORT AND RECOMMENDATION

### I.    Introduction

This Report and Recommendation (R&R) addresses two motions: the motion for summary judgment filed by Defendant Chief Medical Officer (CMO) Carmen McIntyre (ECF No. 69), and the motion for summary judgment filed by Defendants Dr. Bienvenido B. Canlas and Corizon Health, Inc. ("Corizon") (ECF No. 71).

Plaintiff — state prisoner Demetrius McBride — filed this action pursuant to 42 U.S.C. § 1983, the Rehabilitation Act, and the Americans with Disabilities Act on September 16, 2020.  (ECF No. 1.)  In his verified amended complaint, McBride alleged that while he was confined at the Chippewa Correctional Facility (URF) in Kincheloe, Michigan, and the Alger Correctional Facility (LMF) in Munising, Michigan, Corizon, employees of Corizon, and employees of the Michigan Department of Corrections (MDOC): (1) violated McBride's Eighth Amendment rights by acting with deliberate indifference to his serious medical needs, (2) violated McBride's

Fourteenth Amendment equal protection rights, (3) violated the Americans with Disabilities Act, (4) violated the Rehabilitation Act, (5) committed medical malpractice, (6) committed gross negligence, (7) committed assault and battery, and (8) inflicted emotional distress on McBride.  (ECF No. 21, PageID.41-53.)  McBride's claims generally relate to the incision of a mass under his armpit on April 3, 2018, to Defendants' denials of his special accommodation requests in May of 2018 and March of 2019, and to the delays in McBride's receipt of ulnar nerve decompression surgery.  The specifics of those claims are summarized in the table below:

| Cause of Action | Defendant(s) | Date or Date Range | Factual Allegations | Claims |
|---|---|---|---|---|
| One | Dr. Canlas, RN Corpe | April 3, 2018 | Dr. Canlas, with the assistance of Registered Nurse (RN) Corpe, lanced a growth under McBride's armpit without obtaining a consent form or administering local anesthetic. (ECF No. 21, PageID.42-44.) | *Federal:* Deliberate Indifference<br><br>*State:* Medical Malpractice, Gross Negligence, Assault and Battery, Emotional Distress |
| Two | Dr. Canlas, Corizon, RN Corpe | May 17, 2018; May 25, 2018 | RN Corpe and Dr. Canlas denied McBride's request for an air mattress accommodation based on Corizon's special accommodation criteria.  (*Id.*, PageID.44-47.) | *Federal:* Deliberate Indifference |
| Three | Dr. Canlas, Corizon | May 25, 2018– | Dr. Canlas examined McBride's back in May of 2018 and determined that x-rays were necessary. (*Id.*, PageID.46.)  McBride received x-rays and EMGs revealing that he needed nerve decompression surgery on both elbows. (*Id.*, PageID.47-48.)  But McBride did not | *Federal:* Deliberate Indifference, Equal Protection<br><br>*State:* Gross Negligence |

| Cause of Action | Defendant(s) | Date or Date Range | Factual Allegations | Claims |
|---|---|---|---|---|
| | | | undergo surgery on his left elbow until December of 2018 and never received surgery on his right elbow.  (*Id.*, PageID.49.) | |
| Four | CMO McIntyre, Corizon | March 22, 2019 | In March of 2019, a physical therapist recommended that McBride be given a slew of accommodations to help alleviate his back pain. (*Id.*, PageID.50–51.)  CMO McIntyre denied McBride's request for those accommodations based on Corizon's special accommodation criteria.  (*Id.*) | *Federal:* Deliberate Indifference, Equal Protection, American with Disabilities Act, Rehabilitation Act<br><br>*State:* Gross Negligence, Emotional Distress |

McBride sues the individual Defendants in their personal and official capacities, and requests monetary and injunctive relief.  (*Id.*, PageID.53-54.)

Defendants McIntyre, Canlas, and Corizon now move for summary judgment. (ECF Nos. 69, 71.)  They argue that there are no genuine issues of material fact with respect McBride's claims against them, and that they are entitled to judgment. Defendant RN Corpe has yet to be served.

The undersigned respectfully recommends that the Court grant Defendants' motions for summary judgment. The undersigned further recommends that the Court dismiss McBride's claims against Defendant RN Corpe without prejudice.

Although McBride contends that CMO McIntyre violated his Eighth and Fourteenth Amendment rights as well as the RA and ADA when she denied his requests for special accommodations (Cause of Action Four), there is no genuine

dispute as to whether McIntyre was personally involved in the denial of McBride's requests; she was not. Furthermore, an individual cannot be held liable under the ADA or RA, and allegations of inadequate medical care, without more, do not give rise to claims under the ADA or RA.

While McBride contends that Dr. Canlas violated his Eighth Amendment rights by lancing a mass under his armpit without obtaining informed consent or administering anesthesia (Cause of Action One), a lack of informed consent ordinarily does not give rise to a claim of deliberate indifference, nor does a minor medical decision such as whether to administer local anesthesia.  Though McBride also asserts that Dr. Canlas violated his Eighth rights by denying McBride's request for an air mattress (Cause of Action Two) and unnecessarily delaying McBride's receipt of ulnar nerve decompression surgery (Cause of Action Three), there are no genuine issues of material fact as to whether the denial or delay caused McBride's condition to deteriorate; they did not.  Nor are there genuine issues as to whether Dr. Canlas acted with deliberate indifference; Dr. Canlas provided McBride prompt and continuous care.  And while McBride asserts that Dr. Canlas violated his Fourteenth Amendment rights, McBride does not set forth any allegations that Canlas intentionally discriminated against McBride.

Additionally, though McBride asserts that Corizon is liable for violating his Eighth and Fourteenth Amendment rights relating to the denial of McBride's special accommodation requests (Causes of Action Two and Four) and the delay in his receipt of ulnar nerve decompression surgery (Cause of Action Three), McBride does not

proffer evidence of any custom or policy of Corizon that led to the violation of his rights.  And while McBride also asserts that Corizon is liable for violating the ADA and RA related to the denial of McBride's special accommodation requests, allegations of inadequate medical care, without more, do not give rise to claims under the ADA or RA.

Finally, with respect to Defendant RN Corpe (Causes of Action One and Two), the record reflects that McBride has not made attempts to locate RN Corpe since his summons was returned unexecuted in July of 2021.  Though the Court granted McBride's request to proceed in forma pauperis, McBride was still required to make reasonable efforts to locate Corpe's address.

In sum, the records before the Court establish that McBride received prompt and continuous care for a slew of medical concerns that arose throughout the relevant period.  The records do not create a genuine issue as to whether McBride received inadequate care or whether Defendants discriminated against McBride.  Though the undersigned is sympathetic to McBride's medical conditions and frustrations, McBride's circumstances simply do not give rise to federal claims.

If the Court accepts this recommendation, this case will be dismissed.

## II.    Factual Allegations

In his verified amended complaint, McBride says that he is disabled, explaining that he has limited knee and back mobility due to knee surgeries in July and February of 2002, and a spinal fusion in December of 2005.  (ECF No. 21, PageID.41.)

5

McBride says that in April of 2018, he had a mass under his left armpit that measured approximately two-and-a-half inches.  (*Id.*, PageID.41.)  On April 3, 2018, Defendant Dr. Canlas examined the mass, squeezing it between his fingers and causing McBride to cringe in pain.  During this appointment, Dr. Canlas decided that he needed to incise the mass in order to drain it.  (*Id.*)  McBride asked Canlas whether McBride needed to fill out a consent form, but Canlas said that it was unnecessary. McBride says that this response differed from his experience with Dr. Canlas on another date, during which Canlas provided him with a consent form and walked him through the procedure for a skin tag removal.  (*Id.*, PageID.43.)

McBride says that Dr. Canlas and Defendant RN Corpe then ordered McBride to lay on his side on the examination table.  (*Id.*, PageID.42.)  RN Corpe asked Canlas whether she should prepare a local anesthetic, but Dr. Canlas told her that it was unnecessary.  Corpe then provided Canlas with a pair of scissors, which Canlas used to incise the mass.  (*Id.*)  McBride says that the incision caused him excruciating pain, and that he nearly fainted.  Despite McBride's cries, Dr. Canlas continued to cut into the mass, which he then drained by squeezing the incision.  (*Id.*)  McBride says that in addition to the physical pain he experienced as a result of the operation, he began having nightmares, and eventually met with a psychiatrist about the incident.  (*Id.*, PageID.43.)

A few months later, on May 14, 2018, McBride says that he kited[1] Health Care requesting a special accommodation for an air mattress to relieve his chronic pain. (*Id.*, PageID.44.)    McBride says that he previously held an air mattress accommodation from April of 2006 to October of 2012.  (*Id.*, PageID.45.)  But on May 17, 2018, RN Corpe denied McBride's request, citing Corizon's criteria for an air mattress accommodation and explaining that McBride did not meet them.  (*Id.*, PageID.44.)

McBride says that he sent Health Care another kite on May 19, 2018 regarding his chronic back pain.  (*Id.*, PageID.46.)  RN Corpe evaluated McBride on May 22, 2018.  During that appointment, McBride inquired as to why Corpe would not identify an air mattress accommodation as a reasonable option for addressing his back pain. Corpe reiterated that McBride did not meet Corizon's criteria.  (*Id.*)

On May 25, 2018, McBride was examined by Dr. Canlas.  McBride says he informed Canlas that he was experiencing burning pain in his arms.  (*Id.*)  Dr. Canlas determined that McBride may have nerve damage in his neck and said that he would schedule x-rays.  When McBride asked about receiving a special accommodation for an air mattress, Canlas stated that it was Corizon, not Canlas, who set criteria for air mattress accommodations.  (*Id.*, PageID.46-47.)

Dr. Canlas examined McBride again in June of 2018, explaining that McBride's x-rays showed evidence of potential nerve damage.  (*Id.*, PageID.47.)  McBride says

---

[1]    Kites are written communications that prisoners send to staff, including Health Care.

that he received an electromyography (EMG) on his upper limbs on August 14, 2018, which demonstrated significant ulnar neuropathy in his left elbow, ulnar neuropathy in his right elbow, and cervical pain.  (*Id.*, PageID.48.)

McBride then received an EMG on his lower limbs on September 6, 2018. McBride says that the doctor performing the EMG expressed that it was strange to schedule the EMGs of the upper and lower limbs for different dates.  This time, the EMG revealed "chronic active left s1 lumbar radiculopathy." (*Id.*)

On August 26, 2018, McBride says that he was transferred to LMF after receiving a Failure to Disperse Misconduct.

On October 17, 2018, McBride says that an off-site doctor recommended that McBride receive ulnar nerve decompression surgery on both elbows.  (*Id.*) The doctor also recommended a magnetic resonance imaging (MRI) or a computerized tomography (CT) scan of McBride's lumbar spine.  On November 1, 2018, an LMF doctor asked McBride if he still wanted to undergo decompression surgery.  McBride answered in the affirmative and asked about the MRI and CT scans recommended by the off-site doctor.  The LMF doctor allegedly responded by stating: "[W]e're not messing with the back, it could paralyze you."  (*Id.*)

McBride says that he next kited Health Care on November 8, 2018, complaining of "sharp pains in his lumbar spine and cervical area."  (*Id.*, PageID.49.) On November 20, 2018, an RN at LMF told McBride that he had an upcoming appointment with the neurologist, and there was nothing the RN could do for McBride.  The RN would not refer McBride to the facility doctor.  McBride received

ulnar nerve decompression surgery on his left elbow in December of 2018.  (*Id.*)
McBride says that the delay in receiving the decompression surgery caused
irreparable nerve damage as well as chronic neck and arm pain.  (*Id.*)

On January 4, 2019, McBride kited Health Care, complaining of sharp pains
in his spine and requesting access to the elevator in his housing unit.  (*Id.*,
PageID.50.)  On January 8, 2019, McBride met with an LMF nurse.  The nurse
allegedly told McBride that McBride should have been seen by an LMF doctor after
arriving at LMF.  (*Id.*)  The next day, McBride was seen by a Physician's Assistant
(PA).  The PA reviewed McBride's records and said that she would request an MRI.
(*Id.*)  But she would not give McBride an elevator accommodation. On January 28,
2019, McBride received an MRI.  The MRI showed that he had "spondylotic changes"
but "no high grade spinal canal stenosis."  (*Id.*)

McBride says that on March 19, 2019, he was examined by an off-site physical
therapist.  (*Id.*, PageID.50-51.)  The physical therapist ultimately recommended
several accommodations, including athletic shoes, an extra pillow, a hot water bottle,
a lumbar/sacral orthotic brace, and an air mattress.  (*Id.*, PageID.51.)  When McBride
reviewed the physical therapist's report with the PA at LMF, the PA expressed that
she would put in the accommodation requests to Defendant CMO McIntyre, but that
it was unlikely the requests would be approved.   On March 22, 2019, McBride
received word that his requests for special accommodations were denied.  (*Id.*)

On June 13, 2019, McBride kited Health Care about continued back, buttocks,
leg, and toe pain.  (*Id.*, PageID.52.)  Health Care responded, informing McBride that

he could discuss the issues at his next appointment with his provider.  On September 13, 2019, McBride sent Health Care another kite, explaining that his back went out when he was washing his dishes, causing him excruciating pain and limiting his ability to move.  (*Id.*)  Health Care told him to use a hot compress.  (*Id.*, PageID.52-53.)

McBride says that the denial of his special accommodation requests caused him to experience episodes of excruciating back pain, numbness, and the inability to sleep.  (*Id.*, PageID.51-52.)

### III.    Relevant Medical Records

McBride's medical records reflect that on March 20, 2018, he began complaining of back and neck pain.  (ECF No. 71-1, PageID.420.)  During his appointment with one of the RNs at URF, McBride explained that that he had been experiencing back and neck pain for years and requested an MRI "for proper diagnosis."  (*Id.*)  When the RN asked McBride whether he was regularly taking his Tylenol, McBride expressed that he only took Tylenol after he started experiencing pain.  (*Id.*, PageID.421.)  After determining that McBride had a steady gait, sat and stood without difficulty, and did not present acute distress, the RN recommended that McBride take his Tylenol every day as prescribed in order to prevent the pain.

On April 1, 2018, McBride saw another RN at URF, this time complaining of swelling under his left armpit.  (*Id.*, PageID.422.)  The RN examined the area, found that McBride had two boils, and provided McBride with an antibiotic (Bactrim).  (*Id.*, PageID.423.)  The next day, another RN examined the boils, found that they were

draining, cleansed them with saline, and covered them with a dressing.  (*Id.*, PageID.424.)

On April 3, 2018, McBride was examined by RN Corpe and Dr. Canlas.  (*Id.*, PageID.427.)  Dr. Canlas noted nodulo-pustular lesions under McBride's left armpit and on McBride's buttocks.  (*Id.*)  He further noted that the abscess under McBride's left armpit had a punctum, which was draining pustular material.  (*Id.*, PageID.428.)  Dr. Canlas prescribed an antibiotic (Bactrim), and a Ceftriaxone injection.  (*Id.*)  Dr. Canlas later noted the following:

> Provider attempted to enlarge the existing punctum of the L axilla abscess under sterile fashion w/ a pair of miniature forceps however, the patient could not tolerate the procedure d/t pain so the undersigned stopped.  Patient was also advised that injecting Lidocaine anesthetic was not indicated since there was already an existing opening.

(*Id.*, PageID.430.)  A sample taken during this appointment revealed the boils to be carbuncle and furuncle.  (*Id.*, PageID.432.)

The next day, April 4, 2018, another URF RN changed the dressing under McBride's armpit.  (*Id.*, PageID.433.)  McBride indicated that the boils were much smaller.  The RN unsuccessfully attempted to express additional drainage, and after learning that McBride had missed several doses of his antibiotics, provided McBride with education on the importance of taking his antibiotics.  (*Id.*)  The dressings were removed two days later.  (*Id.*, PageID.434.)  McBride's medical records contain no further mention of these boils.

On May 14, 2018, McBride kited health care, requesting an air mattress to help manage his lower back pain.  (*Id.*, PageID.455.)  RN Corpe responded the next

day, informing McBride that he did not meet the criteria for an air mattress but should kite health care if he needed to be seen for back pain.  (*Id.*)

On May 16, 2018, McBride was evaluated by mental health services after complaining that he was experiencing bad dreams, invasive thoughts, and fears related to his April 3, 2018 appointment with Dr. Canlas and RN Corpe.  (*Id.*, PageID.451.)   During the evaluation, McBride reported experiencing symptoms similar to Post-Traumatic Stress Disorder after Dr. Canlas "cut out an unusual hard growth under his arm with [scissors]."  (*Id.*)  Mental health services told McBride that he could request his medical records, and "suggested that more time would help along with attempting to challenge fears [McBride] knows are illogical."   (*Id.*)  McBride was not scheduled for a follow-up appointment with mental health services.

On May 21, 2018, McBride kited health care regarding his back pain as recommended by RN Corpe.  McBride noted that he feared nerve damage, requested an appointment with a doctor, and requested an MRI.  (*Id.*, PageID.456.)  McBride was scheduled for an examination by a URF nurse.  The same day, McBride asked for "the reinstatement of [his] Special Accommodation for [his] prescription shoe/athletic shoe."  The RN who responded noted that McBride's request for athletic shoes was denied in October of 2012, and that McBride was scheduled to see a medical provider regarding his back pain.  (*Id.*, PageID.457.)

On May 22, 2018, McBride was examined by RN Corpe.  (*Id.*, PageID.459.)  RN Corpe noted that McBride had a steady gait when using a cane, and that he was able to sit and stand slowly.  (*Id.*)  She also scheduled McBride for an appointment with

Dr. Canlas, which took place on May 25, 2018. (*Id.*, PageID.459-460.) During the appointment, Dr. Canlas assessed McBride's condition as lumbago and cervicalgia, and ordered x-rays of McBride's neck and spine. (*Id.*, PageID.460.) The x-rays were taken on May 31, 2018, and showed anterior spondylosis of L3, L4, C3, C4, and C7. (*Id.*, PageID.463.) They also displayed degenerative disk changes at the C6/C7 levels. (*Id.*)

On June 8, 2018, Dr. Canlas updated McBride's chart, and placed McBride on work restrictions. (*Id.*, PageID.465-469.) On June 18, 2018, Dr. Canlas put in a request for McBride to receive an EMG of his upper and lower extremities. (*Id.*, PageID.471.) McBride was approved for an EMG of his upper extremities on June 20, 2018. (*Id.*, PageID.474.) On June 28, 2018, Dr. Canlas put in a second request for McBride to receive an EMG of his lower extremities. (*Id.*, PageID.477.) McBride was approved for an EMG of his lower extremities on June 29, 2020. (*Id.*, PageID.480.)

McBride received the EMG of his upper extremities on August 14, 2018. (*Id.*, PageID.481.) That EMG revealed ulnar neuropathy at McBride's left and right elbows, and cervical pain with no evidence of radiculopathy. (*Id.*, PageID.482.) Dr. Canlas reviewed those results with McBride on August 31, 2018. (*Id.*, PageID.491.)

McBride received the EMG of his lower extremities September 6, 2018. (*Id.*, PageID.493.) That EMG revealed unspecified hypertension and lumbago. (*Id.*, PageID.494.) The findings also suggested left S1 lumbar radiculopathy. (*Id.*) Dr. Canlas reviewed those results with McBride on September 14, 2018. (*Id.*,

PageID.499.)   On the same day, Dr. Canlas put in a request for a neurosurgery consult.  (*Id.*, PageID.501.)  That request was approved on September 17, 2018.  (*Id.*, PageID.504.)  On September 26, 2018, McBride was transferred to LMF, thus ending Dr. Canlas's involvement in McBride's medical care.  (*Id.*, PageID.505 (Intrasystem Transfer Summary).)

On October 17, 2018, McBride attended an off-site neurosurgery consult.  (*Id.*, PageID.508.)   The neurosurgeon determined that it was reasonable to consider surgical intervention in the form of ulnar nerve decompression on McBride's left side and stated that he was willing to perform the surgery if McBride decided that he wanted it.  (*Id.*, PageID.509.)  The neurosurgeon also stated that it was "highly likely" that McBride had "developed lumbar stenosis" and stated that he would be willing to review additional imaging of McBride's lumbar spine if approved by the facility.  (*Id.*)  On October 25, 2018, an LMF doctor reviewed the neurosurgery consult with McBride.  (*Id.*, PageID.512.)

McBride informed the LMF doctor that he wanted to undergo the ulnar nerve decompression on November 1, 2018.  (*Id.*, PageID.513.)  The doctor submitted a request for the procedure on November 9, 2018.  (*Id.*, PageID.515.)  The request was approved on November 13, 2018.  (*Id.*, PageID.518.)  McBride underwent ulnar nerve decompression surgery on his left side on November 29, 2018.  (*Id.*, PageID.519.)  He attended a follow-up with the neurosurgeon on December 26, 2018, at which time McBride reported a significant improvement in his symptoms.  (*Id.*, PageID.528.)  The neurosurgeon reiterated to McBride that his right-sided symptoms were not limiting

14

enough to pursue surgical intervention.  The neurosurgeon also noted that McBride complained of ongoing back and leg pain, but that it was up to LMF's medical team to make further decisions regarding the necessity of an MRI or CT.  (*Id.*)

McBride next contacted Health Care about his back pain on January 4, 2019. (*Id.*, PageID.529.)  McBride reported experiencing sharp pains and requested an elevator detail.  He also asked when his MRI or CT scan would be scheduled.  The responding RN scheduled McBride for an appointment and noted that she did not see any consultations recommending an MRI or CT scan.  (*Id.*)  That appointment took place on January 8, 2019, with another RN noting that McBride had a steady gait with a cane and that McBride had been using the stairs for months.  (*Id.*, PageID.531.)

On January 9, 2019, McBride was examined by a physician's assistant at LMF. (*Id.*, PageID.532.)  The PA reviewed McBride's neurosurgery records and noted the neurosurgeon's statement that McBride would have to undergo an MRI or CT scan before the neurosurgeon could further evaluate McBride's lower back pain.  (*Id.*)  The same day, the PA put in a request a lumbar spine MRI.  (*Id.*, PageID.535.)  That request was granted on January 10, 2019.  (*Id.*, PageID.538.)  And McBride underwent an MRI on January 28, 2019.  (*Id.*, PageID.539.)

The MRI reflected that McBride had spondylotic changes at L3-L4, but that there was no arachnoiditis or high-grade spinal canal stenosis.  (*Id.*, PageID.540.) The day after McBride's MRI, the PA put in a request for another neurosurgery consultation.  (*Id.*, PageID.542.)  That request was granted on January 31, 2019.  (*Id.*,

15

PageID.549.)  However, during McBride's February 20, 2019, chronic care visit, the PA noted that the neurosurgeon declined to see McBride after reviewing his results and determining that his issues could not be treated with surgery.  (*Id.*, PageID.551.) The same day, the PA put in a request for McBride to receive physical therapy and a home exercise program.  (*Id.*, PageID.559.)  That request was granted on February 21, 2019.  (*Id.*, PageID.571.)

McBride attended physical therapy on March 19, 2019.  (*Id.*, PageID.573.)  The physical therapist provided McBride with a home exercise program and recommended that McBride receive: (1) athletic shoes, (2) an extra pillow, (3) a hot water bottle, (4) a lumbar/sacral brace, and (5) an air mattress.  (*Id.*, PageID.574.) The next day, McBride's PA placed McBride on work restrictions (*id.*, PageID.580), and requested review of the physical therapist's recommendations (*id.*, PageID.581.) The physical therapist's recommendations for McBride were denied, though the medical records are unclear as to who denied them.  (*Id.*, PageID.582.)

On June 3, 2019, McBride kited Health Care, complaining that his home exercise program was not alleviating his back pain.  (*Id.*, PageID.586.)  On August 13, 2019, McBride had a chronic care visit with his PA, during which McBride reported that some of the medication he was on was helping with his back pain.  (*Id.*, PageID.588.)

McBride's medical records reflect that McBride had prescriptions for pain relievers throughout the relevant time frame.  (*Id.*, PageID.425-589.)  They also

reflect that from April of 2018 to February of 2019, McBride had a prescription for the anti-inflammatory drug Mobic.  (*Id.*, PageID.425-554.)

## IV.    Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005).  The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).  The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## V.    Federal Claims

In order to more easily discern whether this Court should exercise supplemental jurisdiction over McBride's state law claims, the undersigned first addresses Defendants' motions with respect to McBride's federal claims.

### a.    CMO McIntyre's (Cause of Action Four)

The undersigned first turns to McBride's claims against CMO McIntyre.  As provided above, McBride purports to set forth deliberate indifference and equal

protection claims against CMO McIntyre for denying his physical therapist-recommended special accommodation requests.   (ECF No. 21, PageID.50-53.) McBride also purports to set forth claims against McIntyre under the Rehabilitation Act (RA) and Americans with Disabilities Act (ADA) for denying the requests.  (*Id.*, PageID.53.)

### i. Deliberate Indifference (Cause of Action Four)

McBride asserts that McIntyre violated his Eighth Amendment rights when she denied his special accommodation requests.  (ECF No. 21, PageID.53.)   In response to McBride's claims, McIntyre says that she was not personally involved in the denial of his requests.  (ECF No. 70-5, PageID.357 (McIntyre's Affidavit).)

For state actors sued in their personal capacity, liability under § 1983 is premised upon personal involvement in the violation of the plaintiff's rights.  *Miller v. Calhoun Cnty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005); *Bennett v. Schroeder*, 99 F. App'x 707, 713-714 (6th Cir. 2004).   Thus, claims against public officials in their individual capacity "must be based on active unconstitutional behavior and cannot be based upon 'a mere failure to act.'"  *Shehee v. Luttrell*, 199 F.3d 295 (6th Cir. 1999) (quoting *Salehpour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir.1998), cert. denied, 526 U.S. 1115, 119 S.Ct. 1763, 143 L.Ed.2d 793 (1999)).

McIntyre says that she was not involved in the day-to-day care of inmates such as McBride and did not in fact deny his special accommodation requests.  (ECF No. 70-5, PageID.357.)  McIntyre says that in 2019, special accommodation requests went first to Corizon's Utilization Manager.   If the Utilization Manager denied the

18

requests, the inmate's provider could speak with the regional medical director, who could then take the request to Corizon's clinical leadership. (*Id.*)  If Corizon's clinical leadership denied the request, the inmate's provider could ask the Assistant Chief Medical Officers (ACMOs) to review the request.  If the ACMOs agreed with the denial, the provider could take the request to McIntyre. (*Id.*)  According to McIntyre, it was rare for a special accommodation request to come all the way to her.  She says that she has no recollection of any involvement with McBride's special accommodation requests, and that she has no records to the contrary. (*Id.*)

In response, McBride says that he wrote McIntyre a letter about his special accommodation requests and filed grievance LMF-1904-0383-12D1 against her. (ECF No. 77-2, PageID.670-672.)  He asserts that CMO McIntyre "chose to turn a blind eye, leaving [McBride] in dire straits."  (ECF No. 77, PageID.662.)

In the opinion of the undersigned, there are no genuine issues of material fact concerning McIntyre's personal involvement in the violation his constitutional rights; the record before the Court shows that McIntyre was not personally involved.  Even assuming that CMO McIntyre received McBride's letter and grievance and was aware of his special accommodation requests, a failure to intervene does not rise to the level of personal involvement in a constitutional violation.  *See Danforth v. Prison Health Servs.*, No. 12-10159, 2013 WL 1091203, at *4 (E.D. Mich. Jan. 29, 2013) (recommending that the court grant the defendant chief medical officer's motion to dismiss in part because the defendant had no personal involvement in denying the plaintiff's request for specialty medical care, though the defendant was aware of the

denial), *R&R adopted*, No. 12-CV-10159, 2013 WL 1091199 (E.D. Mich. Mar. 15, 2013).

Moreover, as it pertains to McBride's claim against CMO McIntyre in her official capacity,[2] McBride has not set forth a policy or custom of the MDOC that led to the violation of his Eighth Amendment rights.  "Official capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent."  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 n. 55 (1978).  The first inquiry in evaluating such a claim is whether the municipality had a policy or custom.  *Doe v. Claiborne Cnty.*, 103 F.3d 495, 509 (6th Cir. 1996). The policy or custom must be the moving force behind the constitutional injury. *Turner v. City of Taylor*, 412 F.3d 629, 639 (6th Cir. 2005); *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003); *Doe*, 103 F.3d at 508–09.  "To show the existence of a municipal policy or custom leading to the alleged violation, a plaintiff can identify: (1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal violations."  *Baynes*

---

[2]    McIntyre asserts that she is entitled to sovereign immunity in her official capacity.  The undersigned agrees as to McBride's claims for monetary damages but disagrees as to McBride's claims for prospective relief.  *Doe v. Wigginton*, 21 F.3d 733 (6th Cir. 1994) (citing *Ex parte Young*, 209 U.S. 123, 159-60 (1908)) (explaining that official-capacity claims for prospective relief are "deemed to be against only the nominal defendant officers" for sovereign immunity purposes); *see also Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 904 (6th Cir. 2014) (explaining that *Ex parte Young* and its progeny "allow federal courts to enjoin state officers in their official capacity from prospectively violating a federal statute or the Constitution").

*v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir.2005)).

While McBride vaguely asserts in his complaint that he "was left to his own devices when episodes of debilitating back pain occurred . . . because the policies and practices and criteria of the MDOC and Corizon Health Inc. are discriminatory and violating the ADA and Rehabilitation Act," McBride does not identify a specific policy or practice of the MDOC that led to the violation of any of his rights.  Nor does McBride proffer evidence of that policy or practice.  In the absence of such showings, CMO McIntyre is entitled to summary judgment as to McBride's claims against her in her official capacity.  *See Reed-Bey v. Pramstaller*, 607 F. App'x 445, 451 (6th Cir. 2015) ("[The defendants] are entitled to summary judgment on [the plaintiff's] official-capacity claims because he did not establish that his medical treatment was denied or delayed based on an MDOC policy or custom." (citing *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1245 (6th Cir.1989))).  Accordingly, the undersigned respectfully recommends that the Court grant McIntyre summary judgment with respect to this claim.

## ii.  Equal Protection (Cause of Action Four)

In addition to violating his Eighth Amendment rights, McBride contends that CMO McIntyre violated his equal protection rights under the Fourteenth Amendment when she denied his special accommodation requests.  (ECF No. 21, PageID.53.)  The undersigned reiterates that there are no genuine issues of material fact as to CMO

McIntyre's personal involvement of McBride's special accommodation requests.  But even if there were, McIntyre is entitled to summary judgment.

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike. U.S. Const., amend. XIV; *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).  The Equal Protection Clause prohibits only intentional discrimination.  *Washington v. Davis*, 426 U.S. 229, 239 (1976).  To establish intentional discrimination, a plaintiff must show that the state official acted with the purpose of creating an adverse impact on an identifiable group — not simply with an awareness that adverse consequences would result from the state action:

> "Discriminatory purpose" ... implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.

*Ryan v. City of Detroit*, 174 F. Supp. 3d 964, 971 (E.D. Mich. 2016) (quoting *Pers. Admin'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

Despite asserting a violation of his equal protection rights, McBride does not allege in his complaint that McIntyre intentionally discriminated against him. Nor does he identify how McIntyre discriminated against him in his complaint or his response brief.  Accordingly, the undersigned respectfully recommends that the Court grant CMO McIntyre summary judgment with respect to this claim.

22

### iii.  ADA and RA (Cause of Action Four)

McBride next contends that the denial of his special accommodation requests violated his rights under the Americans with Disabilities Act (ADA) and Rehabilitation Act (RA).  (ECF No. 21, PageID.53.)

Title II of the ADA provides, in pertinent part, that no qualified individual with a disability shall, because of that disability, "be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  *Mingus v. Butler*, 591 F.3d 474, 481-82 (6th Cir. 2010) (citing 42 U.S.C. § 12132).  To establish a claim under Title II of the ADA, a plaintiff must show:

(1) that he is a qualified individual with a disability;
(2) that defendants are subject to the ADA; and
(3) that he was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of plaintiff's disability.

*Tucker v. Tennessee*, 539 F.3d 526, 532-33 (6th Cir. 2008) *overruled in part by Anderson v. City of Blue Ash*, 798 F.3d 338, 357 n.1 (6th Cir. 2015);[3] Jones v. City of Monroe, 341 F.3d 474, 477 (6th Cir. 2003).

Similarly, Section 504 of the RA protects any "otherwise qualified individual" from "be[ing] excluded from the participation in, be[ing] denied the benefits of, or be[ing] subjected to discrimination" under specified programs "solely by reason of her or his disability."  29 U.S.C. § 794(a).  An RA claim is based on the following elements:

(1) that the plaintiff is a handicapped person under the Act;

---

[3]    The third element in *Tucker* required a showing that the discrimination be "solely" because of the disability. *Tucker*, 539 F.3d at 535. *Anderson* simply removed the sole-causation requirement. 798 F.3d at 357 n. 1.

    (2) that the plaintiff is otherwise qualified for participation in a program;

    (3) that the plaintiff is being excluded from participation in, being denied benefits of, or being subjected to discrimination under the program solely due to a handicap; and

    (4) the program or activity is receiving federal financial assistance.

*Sanderson v. Mich. High Sch. Athletic Ass'n*, 64 F.3d 1026, 1030-31 (6th Cir. 1995.)

"Apart from the [Rehabilitation Act's] limitation to denials of benefits 'solely' by reason of disability and its reach of only federally funded—as opposed to 'public'— entities, the reach and requirements of both statutes are precisely the same." *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 452-453 (6th Cir. 2008) (quoting *Weixel v. Bd. of Educ. of N.Y.*, 287 F.3d 138, 146 n. 6 (2d Cir. 2002)). Accordingly, ADA and RA claims may be analyzed together. *Thompson v. Williamson Cnty*, 219 F.3d 555, 557 (6th Cir. 2000).

    CMO McIntyre asserts that McBride's ADA and RA claims must be dismissed because: (1) neither statute provides a cause of action against a public official in their individual capacity, and (2) allegations that a plaintiff was denied medical treatment do not state a claim under either statute. The undersigned agrees.

    "Neither the ADA nor the RA impose liability on individuals." *Lee v. Mich. Parole Bd.*, 104 F. App'x 490, 493 (6th Cir. 2004). Instead, they impose liability on public entities, 42 U.S.C. § 12132, and programs receiving federal funding, 29 U.S.C. § 794.

    Furthermore, the ADA and RA "involve discrimination for an alleged disability and not medical treatment for that disability." *Stevenson v. Pramstaller*, No. 2:08-CV-79, 2009 WL 1883878, at *3 (W.D. Mich. June 30, 2009) (dismissing the plaintiff's ADA and RA claims where the plaintiff alleged "that he [was] not being

24

treated for Hepatitis because he [had] Hepatitis"); *Chapman v. Franklin Cnty. Sheriff*, No. 2:22-CV-2524, 2022 WL 2915593, at \*7 (S.D. Ohio July 22, 2022), *R&R adopted*, No. 2:22-CV-2524, 2022 WL 3359283 (S.D. Ohio Aug. 15, 2022) ("[A] prisoner does not state a claim for relief under the ADA for the denial of medical treatment where the claim was merely an Eighth Amendment deliberate indifference claim in another statutory guise."). And this Court has previously determined that complaints regarding special accommodations, without evidence that that the prisoner was denied the benefits of prison services or programs,[4] constitute mere allegations of inadequate medical care not actionable under the ADA or RA. *Butler v. Scholten*, No. 1:19-CV-449, 2019 WL 4126470, at \*7 (W.D. Mich. Aug. 30, 2019).

In sum, because individuals are not liable for violations of the ADA or RA, because allegations of inadequate medical treatment do not state a claim for relief under the ADA or RA, and because McBride has not provided allegations much less evidence that he was denied the benefits of prison services or programs, the

---

[4]    Take, for example, the circumstances set forth in *Douglas v. Muzzin*, No. 21-2801, 2022 WL 3088240, at \*6 (6th Cir. Aug. 3, 2022). There, the plaintiff had a foot deformity and a decade-long special accommodation for orthopedic shoes, but the defendants nevertheless refused to allow the plaintiff to wear his orthopedic shoes. *Id.* at \*7. Because the plaintiff could not ambulate without experiencing immense pain, he missed meals and other prison services for a period of forty-five days.  *Id.* Under those circumstances, the court of appeals determined that there were genuine issues as to whether the defendants violated the ADA and RA.  *Id.* at 8.  In contrast, McBride states that the denial of his special accommodation requests caused him pain and sleeplessness; he does not contend that the denial prevented him from enjoying the benefits of any prison services, programs, or activities.  (ECF No. 21, PageID.52-53.)

undersigned respectfully recommends that the Court grant CMO McIntyre summary judgment with respect to these claims.

### b.  Dr. Canlas (Causes of Action One, Two, and Three)

Turning then to McBride's claims against Dr. Canlas, McBride avers that Dr. Canlas acted with deliberate indifference to his serious medical needs on numerous occasions, all in violation of the Eighth Amendment, and that Dr. Canlas violated his rights under the Equal Protection Clause.  (ECF No. 21, PageID.41-49.)  Dr. Canlas argues that he is entitled to summary judgment on the merits of these claims, but also asserts that McBride failed to exhaust his claim that Dr. Canlas was deliberately indifferent to McBride's serious medical needs when he lanced a mass underneath McBride's armpit.  (ECF No. 71, PageID.409-412, 414-417.)

### i.  Exhaustion (Cause of Action One)

The undersigned first addresses Dr. Canlas's argument that McBride failed to exhaust the deliberate indifference claim related to Dr. Canlas lancing a mass under his armpit.  (ECF No 71, PageID.409-410,)

Pursuant to the applicable portion of the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust his available administrative remedies.  *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 733 (2001).  To properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules.  *Jones*, 549 U.S. at 218-19; *Woodford v. Ngo*, 548 U.S. 81, 90-91

(2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218-19. A prisoner's failure to exhaust his administrative remedies is an affirmative defense, which Defendants have the burden to plead and prove. *Jones*, 549 at 212-16.

MDOC P.D. 03.02.130 (effective July 9, 2007, superseded March 18, 2019) sets forth the applicable grievance procedures for prisoners in MDOC custody at the time relevant to this complaint. It sets forth a three-step process that prisoners must complete in order to exhaust their administrative remedies in accordance with the PLRA. MDOC P.D. 03.02.130 at ¶¶ P-GG. It also sets forth a list of non-grievable issues, which prisoners are not required to pursue through the grievance process in order to exhaust. *Figel v. Bouchard*, 89 F. App'x 970, 971 (6th Cir. 2004); *Mays v. Ky. Dept. of Corr.*, 2018 WL 4603153, at *3 (W.D. Ky. Sept. 25, 2018) ("It is beyond debate that an inmate cannot be required to exhaust administrative remedies regarding non-grievable issues."). However, when other administrative remedies are available, the prisoner is required to exhaust those remedies prior to filing a federal lawsuit.

The parties do not dispute that McBride's deliberate indifference claim against Dr. Canlas for lancing the mass under his arm was grievable. Instead, McBride says that he appealed a grievance through all steps of the grievance process (ECF No. 21, PageID.44), and Dr. Canlas points out that McBride's Step III grievance report does not reflect that a Step III appeal was processed (ECF No, 71, PageID.409). McBride

responds by stating that he never received a response to his Step III appeal, but that he waited well over the sixty-days allotted for a Step III response before filing suit. (ECF No. 77, PageID.658; ECF No. 77-1, PageID.666-667.)  McBride provided this Court with copies of the grievance and appeals.  (ECF No. 77-5, PageID.876-880.)

Drawing all reasonable inferences in favor of McBride as the non-moving party, it appears that McBride's and Dr. Canlas's positions are not inherently at odds; perhaps McBride submitted his Step III grievance, but it was lost in the shuffle. Defendant Canlas does not point to any additional steps that McBride was required to take under these circumstances, and McBride says that he waited for the response before filing suit.  Accordingly, in the opinion of the undersigned, McBride's verified statements regarding the exhaustion of grievance identifier URF-1804-1068-12D are sufficient to create a genuine issue of material fact as to whether McBride properly exhausted his claim.  The undersigned therefore turns to the merits of McBride's claims against Dr. Canlas.

### ii. Deliberate Indifference (Causes of Action One, Two, and Three)

McBride asserts that Dr. Canlas was deliberately indifferent to his serious medical needs on three occasions: (1) when Dr. Canlas lanced a growth underneath McBride's armpit without obtaining informed consent or administering an anesthetic (Cause of Action One), (2) when Dr. Canlas denied McBride's special accommodation request for an air mattress (Cause of Action Two), and (3) when Dr. Canlas delayed

McBride's receipt of ulnar nerve decompression surgery (Cause of Action Three). (ECF No. 21, PageID.41-49.)

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes.  U.S. Const. amend. VIII.  It obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976).  The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner.  *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).  A claim for the deprivation of adequate medical care has an objective and a subjective component.  *Farmer v. Brennan*, 511 U.S. 825, 834

To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious.  *Id.*  In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.  *Id.*

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment."  *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).  If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *Rouster v. Saginaw Cty.*, 749 F.3d 437, 448 (6th Cir. 2014); *Perez v. Oakland Cty.*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727

29

(6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998).

To succeed on a claim of deliberate indifference, a prisoner who has received medical attention "must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell*, 553 F. App'x at 605 (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)). And the prisoner must place medical evidence into the record verifying the detrimental effect of the inadequate treatment. *See Napier v. Madison Cty.*, 238 F.3d 739, 742 (6th Cir. 2001) (establishing that a prisoner must submit verifying medical evidence to support a deliberate indifference claim based on treatment delay); *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897-898 (6th Cir. 2004) (reiterating that a prisoner must submit verifying medical evidence to support a deliberate indifference claim based on inadequate or delayed treatment).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer*, 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.*; *see also Estelle*, 429 U.S. at 105-06 ([A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the

conscience of mankind. . . . Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.")

Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.  Differences in judgment between inmate and prison medical personnel regarding the appropriate medical diagnosis or treatment are not enough to state a deliberate indifference claim. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996).  This is so even if misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The subjective component was recently summarized in *Rhinehart v. Scutt*, 894 F.3d 721 (6th Cir. 2018).  There, the court of appeals stated the following:

> A doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference.  Instead, the plaintiff must show that each defendant acted with a mental state "equivalent to criminal recklessness." This showing requires proof that each defendant "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk" by failing to take reasonable measures to abate it.

> A plaintiff may rely on circumstantial evidence to prove subjective recklessness: A jury is entitled to "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." And if a risk is well-documented and circumstances suggest that the official has been exposed to information so that he must have known of the risk, the evidence is sufficient for a jury to find that the official had knowledge.

But the plaintiff also must present enough evidence from which a jury could conclude that each defendant "so recklessly ignored the risk that he was deliberately indifferent to it."  A doctor is not liable under the Eighth Amendment if he or she provides reasonable treatment, even if the outcome of the treatment is insufficient or even harmful.  A doctor, after all, is bound by the Hippocratic Oath, not applicable to the jailer, and the physician's job is to treat illness, not punish the prisoner. Accordingly, when a claimant challenges the adequacy of an inmate's treatment, "this Court is deferential to the judgments of medical professionals."  That is not to say that a doctor is immune from a deliberate-indifference claim simply because he provided "some treatment for the inmates' medical needs." But there is a high bar that a plaintiff must clear to prove an Eighth Amendment medical-needs claim: The doctor must have "consciously expos[ed] the patient to an excessive risk of serious harm."

*Id.* 738–39 (6th Cir. 2018) (internal citations omitted).

The undersigned addresses each of McBride's deliberate indifference claims against Dr. Canlas in turn.

### 1. Lancing the mass under McBride's armpit without obtaining informed consent or administering an anesthetic (Cause of Action One)

McBride first asserts that Dr. Canlas was deliberately indifferent to McBride's serious medical needs when Dr. Canlas lanced a mass under McBride's arm without obtaining informed consent or administering a local anesthetic.  (ECF No. 21, PageID.42-43.)  In doing so, McBride says that Dr. Canlas did not afford McBride "the propper [sic] procedure – protocol or standard of care due to him." (*Id.*, PageID.43.) McBride says that the incident caused him severe psychological distress.  (Id.)

Dr. Canlas argues that this claim should be dismissed because McBride's disagreement with Dr. Canlas's decision not to use local anesthesia does not state a claim of deliberate indifference. (ECF No. 71, PageID.412.)  Additionally, Dr. Canlas

says that contrary to McBride's assertion, he used forceps to enlarge an already existing punctum; Dr. Canlas never used scissors or any other cutting tool. (*Id.*, PageID.411.) Also contrary to McBride's assertions, Dr. Canlas says that he stopped attempting to drain the abscess once McBride expressed that he was in pain. (*Id.*) Dr. Canlas then "ordered for Mr. McBride to continue his antibiotic treatment, prescribed a Ceftriaxone injection, and ordered continued dressing changes. By April 10, 2018, the abscess was no longer active or draining." (*Id.*)

As an initial matter, the undersigned acknowledges that there are issues of fact concerning whether Dr. Canlas utilized scissors to lance the mass or forceps to enlarge an already-existing punctum, and whether Dr. Canlas stopped manipulating the mass immediately after McBride asked him to, or after. But for the following reasons, the undersigned finds these issues to be immaterial.

First, the failure to obtain informed consent before providing medical care does not state an Eighth Amendment claim under the circumstances presented. *Compare Rose v. Damron*, No. 2:16-CV-242, 2019 WL 1397087, at *2 (W.D. Mich. Mar. 28, 2019) (citing *Davis v. Agosto*, No. CIV.A.3:01-CV-180-S, 2002 WL 1880761, at *3 (W.D. Ky. Aug. 15, 2002), *aff'd*, 89 F. App'x 523 (6th Cir. 2004)) (finding that the plaintiff did not state an Eighth Amendment claim by alleging that the defendant performed a rectal exam without his consent), *with Knecht v. Gillman*, 488 F.2d 1136 (1973) (finding that the administration of apomorphine, a drug that induces long periods of vomiting, in order to treat behavioral problems constitutes cruel and unusual punishment in the absence of informed consent), *and Mackey v. Procunier*, 477 F.2d

877 (9th Cir. 1973) (finding that the plaintiff stated an Eighth Amendment claim by alleging that state prison employees administered experimental psychiatric medication without obtaining his consent).

By McBride's own account, Dr. Canlas attempted to drain McBride's abscess with his fingers, and, when that was unsuccessful, told McBride that he would need to incise the mass in order to drain it.  (ECF No. 21, PageID.42.)  McBride did not protest.  Instead, McBride asked Dr. Canlas whether McBride needed to fill out an informed consent form.  (*Id.*)  Dr. Canlas said that he did not and told McBride to lay on his side.  (*Id.*, PageID.41-42.)  McBride did not protest.  RN Corpe asked Dr. Canlas whether she should prepare local anesthesia, Dr. Canlas said no.  (*Id.*, PageID.42.)  Despite the fact that Dr. Canlas's previous attempt to drain the abscess with his finger caused McBride pain, McBride did not protest.   It was only after Dr. Canlas began to incise (or, according to Dr. Canlas, enlarge the already existing punctum of) McBride's abscess that McBride says he complained of the pain, and asked Dr. Canlas to stop.  (*Id.*)  According to McBride, Dr. Canlas stated that he was "almost there," and then used his fingers to successfully drain at least part of the abscess.  (*Id.*)

Second, "minor medical decisions, including whether [a] procedure merits a local anesthetic . . . are 'classic example[s] of matter[s] for medical judgment.'" *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996) (quoting *Estelle*, 429 U.S. at 107) (finding that a doctor's decision not to administer a local anesthetic before removing the plaintiff's toenail did not amount to deliberate indifference).

34

McBride does not assert that Dr. Canlas provided unnecessary or inadequate treatment, or that his actions caused the abscess to worsen.[5]  Instead, McBride complains that by not obtaining his consent, Dr. Canlas violated protocol, and asserts that Dr. Canlas should have provided him with a local anesthetic.  Without more, the failure to adhere to protocol does not state an Eighth Amendment claim.  *Estelle*, 429 U.S. at 106.  Nor does a prisoner's disagreement with a medical provider's course of treatment.  *Sanderfer*, 62 F.3d at 154-55; *Ward*, 1996 WL 627724, at *1.  Finally, the undersigned notes that Dr. Canlas's decision here – to proceed without local anesthesia – is exactly the  type of decision a primary care physician would make when treating his or her patient.  For all the reasons set forth above, the undersigned respectfully recommends that the Court grant Dr. Canlas summary judgment with respect to this claim.

### 2.  Denying McBride's special accommodation request for an air mattress (Cause of Action Two)

McBride next asserts that Dr. Canlas was deliberately indifferent to his chronic neck and back pain when McBride asked about a special accommodation for an air mattress on May 25, 2018, and Dr. Canlas denied his request.  (ECF No. 21, PageID.44-48.)  Dr. Canlas argues that he had no personal involvement in the denial of McBride's request for an air mattress, and that McBride has provided no evidence

---

[5]    In fact, when McBride was seen for a dressing change the next day, he informed the RN that the abscesses were "much smaller."  (ECF No. 71-1, PageID.433.)

that the denial of his air mattress was detrimental to his back condition.  (ECF No.
71, PageID.414.)

As an initial matter, the undersigned reiterates that liability under § 1983 with
respect to a state official in their individual capacity is premised upon the official's
personal involvement in the violation of the plaintiff's rights.  *Miller*, 408 F.3d at 817
n.3; *Bennett*, 99 F. App'x at 713-714.  McBride says that he asked about an air
mattress accommodation during his May 25, 2018 appointment with Dr. Canlas, and
that Dr. Canlas replied: "it is Corizon who creates the criteria for who is eligible for
an air/foam mattresses [sic] not me."  (ECF No. 21, PageID.47.)  The undersigned is
not convinced that this remark amounts to personal involvement in the denial of
McBride's accommodation request.  But even if Dr. Canlas's remarks were sufficient
to establish personal involvement, McBride has not created a genuine issue of
material fact with respect to the objective or subjective components of this deliberate
indifference claim.

Turning first to the objective component of McBride's claim, it is important to
note that this is a claim of inadequate medical care.  Even assuming that Dr. Canlas
played a part in denying McBride's request for an air mattress, Dr. Canlas took a host
of actions to address McBride's neck and back pain.  On May 25, 2018, the same date
that the parties allegedly discussed McBride's request for an air mattress, Dr. Canlas
began ordering diagnostic procedures.  (ECF No. 71-1, PageID.459-460.)  Between
May 25, 2018 and September 17, 2018, Dr. Canlas ordered x-rays, submitted multiple
requests for EMGs, and requested a neurosurgical consult with respect to McBride's

back and neck pain. (*Id.*, PageID.459-504.)  In the meantime, Dr. Canlas and placed McBride on a temporary work restriction.  (*Id.*, PageID.465-469.)  And McBride maintained prescriptions for anti-inflammatory drugs (Mobic) and pain relievers throughout the relevant timeframe for his claims. (*Id.*, PageID.425-554.)  It therefore clear that McBride received treatment for his neck and back pain.

Because Dr. Canlas treated McBride's condition, McBride had to set forth evidence that the treatment "so woefully inadequate as to amount to no treatment at all," *Mitchell*, 553 F. App'x at 605 (quoting *Alspaugh*, 643 F.3d at 169 (6th Cir. 2011)); he did not.  In other words, McBride provided no evidence that the denial of his request for an air mattress accommodation was detrimental to his back condition; there are no genuine issues of material fact as to the objective component of McBride's claim.

But even if McBride had created a genuine issue of material fact as to the objective component of his claim, he has not created a genuine issue of material fact as to the subjective component.  As set forth above, the state of mind necessary to satisfy the subjective component of deliberate indifference claim is akin to criminal recklessness. *Rhinehart*, 894 F.3d at 738.  As is also set forth above, Dr. Canlas took a slew of actions in response to McBride's condition, ordering diagnostic procedures, referring McBride for neurosurgical consults, providing McBride with pain relievers, and placing McBride on work restrictions.  These decisions do not reflect that Dr. Canlas harbored a state of mind akin to criminal recklessness when it came to McBride's medical needs.  Instead, it is apparent that McBride simply disagrees with

37

the treatment he received, believing that Dr. Canlas should have given him an air mattress instead of or in addition to the treatment Dr. Canlas provided McBride. Differences in medical judgment between a prisoner and a medical professional do not state a claim of deliberate indifference. *Sanderfer*, 62 F.3d at 154-55; *Ward*, 1996 WL 627724, at *1. As such, the undersigned respectfully recommends that the Court grant Dr. Canlas summary judgment with respect to this claim.

### 3. Delaying McBride's receipt of ulnar nerve decompression surgery (Cause of Action Three)

McBride finally asserts that Dr. Canlas acted with deliberate indifference to McBride's serious medical needs when he delayed McBride's receipt of ulnar nerve decompression surgery. (ECF No. 21, PageID.48-49.)

The undersigned construes this deliberate indifference claim as one of delayed (left elbow) and inadequate (right elbow) care. As set forth above, McBride underwent nerve decompression surgery on his left elbow in December of 2018 but has yet to receive nerve decompression surgery on his right elbow. However, McBride has received medical care with respect to his right elbow; he has undergone a series of diagnostic tests and received pain care.

Because this claim concerns delayed and inadequate care, McBride was again required to place medical evidence into the record verifying the detrimental effect of the delayed and inadequate treatment. *Napier*, 238 F.3d 739, 742; *Blackmore*, 390 F.3d at 897-98. He did not. Although McBride asserts that the delay between his May 25, 2018 appointment with Dr. Canlas and his left ulnar nerve decompression surgery "exacerbated and caused Plaintiff's irreparable nerve damage and chronic

38

pains in his neck, left and right arms," he provides no evidence of such exacerbation.[6] (ECF No. 21, PageID.47.)    In fact, during the December 26, 2018 follow-up appointment for McBride's decompression surgery, McBride's neurosurgeon specifically noted that McBride had "symptomatically improved significantly" and that McBride "has right-sided symptoms, but they are not limiting enough to pursue intervention." (ECF No. 71-1, PageID.528.)

But even if McBride had placed the requisite medical evidence in the record, McBride has again failed to create a genuine issue of material fact with respect to the subjective component of his claim.    Here, the analysis is substantially the same as that of McBride's air mattress accommodation claim: Dr. Canlas began ordering diagnostic procedures almost immediately following McBride's complaint of worsening back and neck pain.    Dr. Canlas ordered x-rays of McBride's back and spine following McBride's May 25, 2018 appointment.    (ECF No. 71-1, PageID.462.)    The x-rays took place on May 31, 2018.    (*Id.*, PageID.463.)    Dr. Canlas placed McBride on work restrictions on June 8, 2018, and on June 18, 2018, Dr. Canlas requested an EMG of McBride's upper and lower extremities.    (*Id.*, PageID.465-469.)    When McBride was only approved for an EMG of his upper extremities on June 20, 2018, Dr. Canlas put in a second request for an EMG of McBride's lower extremities on

---

[6]    The undersigned acknowledges McBride's assertions that he "has suffered chronic pains in his arms and neck for years and has made Health Care complaints that ha[ve] resulted in radiology exams up until the necessary surgery only to his left elbow by Dr. Coccia." (ECF No. 21, PageID.49.)    However, the allegations in McBride's complaint with respect to Dr. Canlas span from May 25, 2018 to September 26, 2018.

June 28, 2018.  (*Id.*, PageID.474, 477.)  McBride received the first EMG on August 14, 2018, and the second on September 6, 2018.  (*Id.*, PageID.481, 493.)  On September 14, 2018, Dr. Canlas requested a neurosurgery consult for McBride.  (*Id.*, PageID.499.)  On September 26, 2018, McBride was transferred and assigned a new medical provider.

By all indications on the record, Dr. Canlas provided McBride with prompt and continuous medical care for his back and neck pain during the relevant period. Furthermore, nothing in the record indicates that Dr. Canlas acted with deliberate indifference in treating McBride.  Accordingly, the undersigned respectfully recommends that the Court grant Dr. Canlas summary judgment with respect to this claim.

### iii.  Equal Protection (Cause of Action Three)

In addition to violating his Eighth Amendment rights, McBride contends that Dr. Canlas violated his equal protection rights under the Fourteenth Amendment when Canlas delayed ulnar nerve decompression surgery for McBride's left elbow and denied decompression surgery for McBride's right elbow.  (ECF No. 21, PageID.49.)

As state above, the Equal Protection Clause prohibits only intentional discrimination.  *Washington*, 426 U.S. at 239.  To establish intentional discrimination, a plaintiff must show that the state official acted with the purpose of creating an adverse impact on an identifiable group — not simply with an awareness that adverse consequences would result from the state action.  *Ryan*, 174 F.Supp.3d at 971 (quoting *Pers. Admin'r of Mass.*, 442 U.S. at 279).

40

Despite asserting a violation of his equal protection rights, McBride does not allege that he was discriminated against in his complaint.  (*See* ECF No. 21, PageID.47-48.)  Nor does he assert that Dr. Canlas discriminated against him in his response brief.  (*See* ECF No. 77).  Accordingly, the undersigned respectfully recommends that the Court grant Dr. Canlas' summary judgment with respect to this claim.

### c.  Corizon (Causes of Action Two, Three, and Four)

In addition to bringing the following claims against CMO McIntyre and Dr. Canlas, McBride brought the claims against Corizon: (1) deliberate indifference related to Dr. Canlas's denial of McBride's air mattress accommodation request (Cause of Action Two), (2) deliberate indifference related to the delay and denial of McBride's ulnar nerve decompression surgeries (Cause of Action Three), (3) violation of McBride's equal protection rights related to the delay and denial of McBride's ulnar nerve decompression surgery (Cause of Action Three), (4) deliberate indifference related to CMO McIntyre's denial of the physical therapist-recommended accommodations (Cause of Action Four), and (5) violation of the ADA and RA related to CMO McIntyre's denial of the physical therapist-recommended special accommodation requests (Cause of Action Four).  (ECF No. 21, PageID.44-53.)

41

### i. Deliberate Indifference (Causes of Action Two, Three, and Four)

Although McBride named Corizon as a defendant for three of his deliberate indifference claims, the claims fail for the same reason, and it is therefore unnecessary to analyze them separately.

In evaluating a municipal liability claim,[7] a court must first determine whether the municipality had a policy or custom. *Doe,* 103 F.3d at 509. The policy or custom must be the moving force behind the constitutional injury. *Turner*, 412 F.3d at 639; *Alkire*, 330 F.3d at 815; *Doe*, 103 F.3d at 508–09.  "To show the existence of a municipal policy or custom leading to the alleged violation, a plaintiff can identify: (1) the municipality's . . . official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal violations." *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir.2005)).

---

[7]      "The principle is well settled that private medical professionals who provide healthcare services to inmates at a county jail qualify as government officials acting under the color of state law for the purposes of § 1983." *Winkler v. Madison Cty.*, 893 F.3d 877, 890 (6th Cir. 2018) (citing *Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008)).  Similarly, the delivery of health care by a private provider to state prisoners pursuant to a contract with the state constitutes actions under color of state law for purposes of § 1983.  *West v. Atkins*, 487 U.S. 42, 57 (1988).  As such, Corizon may be held liable under § 1983.  *See, e.g., Nobles v. Quality Correctional Care of Michigan*, et al., No. 1:21-CV-199, 2021 WL 1827077, at *5 (W.D. Mich. May 7, 2021) ("Corizon, like a governmental entity, may be held liable under § 1983 if it actually caused the constitutional deprivation.").

Although McBride seeks to assert a variety of claims against Corizon, McBride makes but two purported factual allegations against Corizon in the entirety of his verified complaint.  First, McBride says that Corizon "has created the custom and practices [sic] of the Physicians, Physician's Assistants and Registered Nurses to blame [Corizon] for their criteria and abdication to prisoner patients, and if not for such a criteria [sic], they would follow their medical training and order the mattresses and soft shoes for the benefit and recovery it gives to the patient."  (ECF No. 21, PageID.46.)  Second, McBride asserts that "[t]he delay in receiving the necessary surgery to plaintiff's right arm performed by Dr. Coccia, is due to the M.D.O.C., its Health Care officials, and Corizon Health Inc. [sic] ineptness and being deliberate [sic] indifferent to plaintiff needed medical care."  (*Id.*, PageID.49.)

Conclusory allegations that an entity had a custom or policy, even those contained in a verified complaint, are insufficient to create a genuine issue of material fact so as to survive summary judgment on a claim of municipal liability.  *See Est. of Abbey v. Herring*, 598 F. Supp. 3d 572, 582, 589-90 (E.D. Mich. 2022) (explaining that the plaintiff's allegations against Corizon, including that Corizon "has policies, practices, or customs that demonstrate and foster deliberate indifference to the medical treatment of prisoners," were conclusory and therefore insufficient to state a *Monell* claim); *Woollard v. Corizon Health, Inc.*, No. 2:18-CV-11529, 2021 WL 2349302, at *12 (E.D. Mich. Jan. 7, 2021) (finding that the plaintiff's allegation that Corizon had a "recently-enacted policy and custom of scaling back medical assistive devices as a cost-cutting device," was conclusory and therefore insufficient to state a

43

*Monell* claim), *R&R adopted*, No. 18-CV-11529, 2021 WL 1827201 (E.D. Mich. May 7, 2021), *reconsideration denied*, No. 18-CV-11529, 2021 WL 3673916 (E.D. Mich. Aug. 19, 2021).

Although McBride asserts that Corizon has created a custom or policy of denying medically necessary special accommodations, he proffers no evidence that Corizon or any of its employees in fact denied medically necessary special accommodations.[8]   And although McBride says that Corizon was "inept" and "deliberately indifferent" when it came to his ulnar nerve decompression surgery, he does not even purport to identify a problem custom or policy.  These allegations are plainly insufficient to create a genuine issue of material fact as to whether Corizon has a custom or policy leading to the violation of McBride's Eighth Amendment rights.

In sum, the undersigned respectfully recommends that the Court grant Corizon summary judgment on McBride's deliberate indifference claims against it because there are no genuine issues of material fact concerning whether Corizon had a custom or policy that acted as the driving force behind a violation of McBride's Eighth Amendment rights; it did not.

---

[8]    As set forth above, despite McBride's claims that he was denied medically necessary accommodations, he provided no evidence that the denial of his request caused a deterioration in his condition such that the denial constituted deliberate indifference to his serious medical needs.

### ii.   Equal Protection (Causes of Action Three and Four)

Turning to McBride's equal protection claims against Corizon relating to the ulnar nerve decompression surgeries and the denial of the physical therapist-recommended special accommodations, the undersigned again emphasizes two things: (1) McBride has not so much as alleged a policy or custom that resulted in the violation of his equal protection rights, and (2) McBride has not alleged that he was intentionally discriminated against.

To reiterate, plaintiffs asserting § 1983 claims against an entity such as Corizon must show that the entity had a policy or custom that led to the violation of their rights. *Doe*, 103 F.3d 495, 508-09. And plaintiffs asserting a violation of their equal protection rights must show that the defendants acted with discriminatory purpose. *Washington*, 426 U.S. at 239. Once again, asserting that he experiences episodes of back pain because "practices and criteria of the M.D.O.C. and Corizon Health Inc. are discriminatory and violating the ADA and Rehabilitation Act" is purely conclusory, and insufficient to state a claim against Corizon. *See Herring*, 598 at 582, 589-90; *Woollard*, 2021 WL 2349302, at *12.

Because there are no genuine issues of material fact as to the above-mentioned requirements, the undersigned respectfully recommends that the Court grant Corizon summary judgment with respect to this claim.

### iii.   ADA and RA (Cause of Action Four)

McBride finally asserts that Corizon violated his rights under the ADA and RA. This claim, like many of McBride's previous claims, relates to the denial of his

special accommodation requests.  For the requirements of ADA and RA claims, the undersigned refers to the above analysis of McBride's ADA and RA claims against Defendant McIntyre.

Ultimately, McBride offers no evidence of disability discrimination that transcends conclusory allegations.  Nor does he allege that he was denied the benefits of any prison services or programs aside from adequate medical care.  To reiterate, the ADA and RA "involve discrimination for an alleged disability and not medical treatment for that disability." *Stevenson*, 2009 WL 1883878, at *3; *Chapman*, 2022 WL 2915593.  McBride cannot transform his deliberate indifference claims into ADA and RA claims by simply relabeling them as such.

Accordingly, the undersigned respectfully recommends that the Court grant Corizon summary judgment with respect to these claims.

## VI.    State Claims

As mentioned above, McBride asserts various state law claims in addition to his federal claims.  In determining whether to retain supplemental jurisdiction over state law claims, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993).  Ordinarily, when a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state-law claims. *Id.*  Dismissal, however, remains "purely discretionary." *Carlsbad*

46

*Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012).

If the Court adopts the undersigned's recommendation, it will dismiss all of McBride's federal claims.  The balance of the relevant considerations would therefore weigh against the exercise of supplemental jurisdiction.   As such, respectfully recommends that the Court decline to exercise supplemental jurisdiction.

## VII.   Failure to Serve

As a final matter, the undersigned addresses the lack of service with respect to Defendant Corpe.  Federal Rule of Civil Procedure 4(m) sets forth the deadline for service of process.  It provides the following:

> If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed. R. Civ. P. 4(m).

McBride filed his complaint on September 16, 2020 — more than two years ago.  (ECF No. 1.)  Because this Court granted McBride leave to proceed *in forma pauperis*, this Court was obligated to issue McBride's summons to the U.S. Marshals for service "once reasonable steps [were] taken to identify for the court the defendants named in the complaint."  *Byrd v. Stone*, 94 F.3d 217, 219 (6th Cir. 1996); *see also* 28 U.S.C. § 1915(d) ("The officers of the court shall issue and serve all process and perform all duties in such cases.").

47

McBride initially provided the Court with Corpe's former work address.  (ECF No. 1, PageID.3.)  At the direction of the Court, the U.S. Marshals Service made three attempts to deliver notices of this lawsuit and requests for waiver of service to Corpe at the work address provided by McBride.  After the third unsuccessful attempt, this Court ordered the MDOC to furnish the U.S. Marshals with Corpe's last-known address.  (ECF No. 40, PageID.40, PageID.184.)  Once the MDOC complied with the Court's order, the U.S. Marshals attempted to serve process at the furnished address but were unsuccessful.  (ECF No. 41, PageID.186.)  The summons was returned unexecuted on July 29, 2021.  (*Id.*)

McBride has repeatedly acknowledged that Corpe has not been served and has expressed that he is unsure how to proceed with respect to Corpe.  (ECF No. 82, PageID.925; ECF No. 75, PageID.641-642.)  However, it does not appear from the record that McBride has put forth any effort to locate Corpe's current address over the last eighteen months.  *Cf. Rucker v. Lindamood*, No. 1:16-CV-00090, 2021 WL 4149131, at *3 (M.D. Tenn. Sept. 13, 2021) (acknowledging that the plaintiff tried to locate the defendant's address by having his family look the defendant up on social media).  Nor does the record reflect that the Court or its officers are responsible for any delay in effectuating service on Corpe.  *Cf. Byrd*, 94 F.3d at 220 (finding that there was good cause to extend the deadline for service because the clerk of court never issued the plaintiff's summons to the U.S. Marshals for service).

Ultimately, because the record reflects that McBride has not made additional attempts to locate Defendant Corpe since his summons was returned unexecuted in

July of 2021, the undersigned recommends that the Court dismiss McBride's claims against Defendant Corpe without prejudice.  Though the burden of effectuating service shifted to the Court and its officers once the Court granted McBride leave to proceed *in forma pauperis*, McBride was still responsible for taking reasonable steps to locate Defendant Corpe.  *See VanDiver v. Martin*, 304 F. Supp. 2d 934, 940 (E.D. Mich. 2004) ("[A] plaintiff may not remain silent and do nothing to effectuate service. At minimum, a plaintiff should request service upon the appropriate defendant and attempt to remedy any apparent service defects of which a plaintiff has knowledge." (quoting *Rochon v. Dawson*, 828 F.2d 1107, 1109 (5th Cir. 1987))).  McBride has not taken such steps.

## VIII.  Recommendation

The undersigned respectfully recommends that the Court grant Defendants' motions for summary judgment (ECF Nos. 69, 71).  The undersigned further recommends that the Court dismiss McBride's claims against Defendant RN Corpe without prejudice.

While the undersigned is sympathetic to McBride's medical conditions, the records before the Court reflect that McBride received prompt and continuous care during the relevant period.  Furthermore, the filings in this case reflect that McBride has not made any affirmative efforts to locate Defendant Corpe's current address in over eighteen months.

If the Court accepts this recommendation, this case will be dismissed.


Dated:   January 27, 2023                          /s/ *Maarten Vermaat*
                                                   MAARTEN VERMAAT
                                                   U. S. MAGISTRATE JUDGE



## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).